Opinion issued January 9, 2020



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00011-CV

———————————

## RICHARD ANDERT ROBINS, Appellant

## V.

## COMMISSION FOR LAWYER DISCIPLINE D/B/A TEXAS BAR A/K/A STATE BAR OF TEXAS, Appellee

On Appeal from the 61st District Court
Harris County, Texas
Trial Court Case No. 2018-46488

## MEMORANDUM OPINION

Richard Andert Robins appeals the denial of his motion, filed pursuant to the

Texas Citizen's Participation Act (TCPA),[1] to dismiss the Commission for Lawyer

---

[1]     We note that, in its most recent session, the Texas Legislature amended the TCPA. The amendments became effective September 1, 2019. Because this suit was filed

Discipline's petition alleging Robins engaged in professional misconduct.[2] In four issues, Robins argues that the trial court erred in denying his motion because (1) the TCPA applies to disciplinary proceedings; (2) the Commission's disciplinary action against him is based on, related to, or in response to TCPA-protected communications; (3) the Commission failed to come forward with sufficient evidence to establish a prima facie case to support its claims; and (3) he established defenses to the Commission's claims.

We affirm.

## Background

In July 2012, Cindy Crisp sold certain items of personal property to estate liquidator John Sauls for a total price of $6,893.21. Sauls sent Crisp payment in the form of two checks, both of which bounced.

By handwritten letter dated October 3, 2013, Crisp asked attorney Robins to help her recover "the value of checks plus interest and attorney/court costs" from Sauls, and she stated that she "understands the attorney fees will not be of normal value and that Rich Robins is doing this to help her to honor the checks that were

before the effective date of the amendments, it is governed by the statute as it existed before the amendments, and all of our citations and analysis are to the TCPA as it existed prior to September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1–12, 2019 Tex. Sess. Law Serv. 684, 684–87 (codified at TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011).

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.008(b) (authorizing interlocutory appeal of order denying motion to dismiss filed under TCPA section 27.003).

written [non-sufficient funds] and fees and costs." The record contains a check from Crisp to Robins for $350, which Robins states was payment for court costs.[3]

Crisp suffered from multiple sclerosis, and according to Robins, her health steadily declined until communication with her stopped altogether. Despite having fallen out of contact with Crisp for over two years and having been unable to reach her or to find anything through internet research indicating whether she had died or was still alive, Robins filed suit on behalf of Crisp on November 17, 2016, to collect payment from Sauls for the bounced checks. As he explained in later pleadings, he did so "thinking that [Crisp was] hopefully still alive somewhere, albeit in a potentially very compromised state of health." The petition Robins filed on behalf of Crisp stated that Crisp "would diplomatically settle this case through her legal counsel for $14,338 if no further wrangling is necessary to finally conclude this unfortunate matter."

Not long after filing suit, Sauls's attorney, Kurt Noell, offered to settle the case for the amount of the debt plus $2,500 for loss of use and attorney's fees. Robins—despite knowing he could not contact his client or even confirm that she was indeed alive—sent Noell an email rejecting the offer, explaining that "[a]lthough Plaintiff Crisp has always believed that she deserves more, I can assure

---

[3]    Nothing in the record aids in understanding how Crisp knew Robins, or why she chose to write to him for help, and Robins maintains that he never actually spoke with or met Crisp.

3

you that this case would be fully nonsuited with prejudice within 24 hours of our timely receiving the liquid funds contemplated & quantified in the abovementioned settlement demand."

About two months later, in March 2017, Noell served discovery on Robins. Around the same time, Robins located Crisp's two sons, Austen and Jon Clinkenbeard, who informed Robins that their mother had indeed died in 2015. An email from Robins to the Clinkenbeard brothers confirms that Robins had been made aware of Crisp's death by March 15, 2017, stating that "[i]t is unfortunate that we do not have Cindy with us any longer." Having made contact with the Clinkenbeard brothers, Robins began to correspond with them to urge them to become involved in the litigation.

In one of his emails to the Clinkenbeard brothers, dated June 21, 2017, Robins remarked,

> I want to get you guys the biggest award realistically obtainable, but I need to balance that with how law school's painfully expensive. At nearly 10% annually compounded interest, you can imagine how excruciating that pain is especially for someone who already repaid the principal of his student loans long ago . . . but who still owes considerably more because the greedy feds charge such a high premium for student loans . . . .

And in another email, dated September 26, 2017, Robins stated, "billing Sauls for my several dozen (and growing) hours of attorney time . . . naturally remains a priority for me. The (interest-accruing) cost of law school helps make that

understandable." He added, "If you know of anyone who would rather pay my attorney's fess instead of Sauls though (such as [Crisp's] insurance policy that might apply?), by all means I'm all ears."

Trial was set for April 3, 2017, but Robins failed to appear, and the trial court dismissed the case for want of prosecution. Robins filed "Plaintiff Cindy Crisp's Verified Motion to Reinstate," claiming he was unaware of the setting, and the trial court granted the motion, which, notably, did not mention that Crisp had died over two years earlier.

As the case proceeded, Robins was unable to respond to Sauls's discovery requests because he had no living client to provide the answers. He did, however, according to Noell's affidavit, discuss with Noell potential dates for Crisp's deposition—offering not a hint that she had long since died.

When Robins failed to respond to Sauls's discovery requests, Sauls filed a motion for sanctions, which the trial court set for a hearing on June 29, 2017. A few days before the hearing was to occur, Robins sent an email to the Clinkenbeard brothers proposing that they execute retainer agreements permitting him to represent them instead of Crisp. Robins urged the brothers to sign the agreements, opining that he "would not be surprised if the jury awards [them] in excess of $63k."

In the email, Robins also acknowledged that neither the court nor opposing counsel was aware of Crisp's death, and he stated that this might allow him to avoid monetary sanctions in the upcoming hearing: "Sauls, his lawyer and the court presumably don't yet know that Cindy has passed away, but if we could get everything nevertheless taken care of beforehand so that I can submit stuff to opposing counsel by the early part of next week, then that would help me try to avoid Sauls' winning a monetary sanction this Thursday."

On June 27, 2017, two days before the sanctions hearing was to occur, Robins emailed the court administrator asking whether "there a desired protocol for a suggestion of death of a plaintiff" and stating that Crisp "is reportedly no longer with us . . . . whether opposing counsel knows it or not" and that "her son wants to fill in for her." The email did not indicate that Crisp had been dead for years.

It appears from the record that in response to the suggestion of Crisp's death, the trial court cancelled the June 29 hearing and instead held a telephonic hearing, during which Robins "represented that Cindy Crisp was probably dead." The trial court directed Robins to produce proof of Crisp's death.

Several things happened as a result of the telephonic hearing. On July 4, 2017, Robins obtained from the Clinkenbeard brothers a signed retainer agreement, purporting to authorize Robins to represent Crisp through Austen. Importantly, the

agreement stated that Robins's fees would be paid by Sauls. It also stated that Robins "has full settlement authority to settle for any amount for Austen and also for any amount for his own attorney's fees, neither of which needs to come at the expense of the other."

The hearing also prompted Noell to demand that Robins produce Crisp's death certificate and any evidence showing whether her estate had been probated. On July 17, Robins obtained Crisp's death certificate, which he emailed to Noell on July 28. But Robins did not provide evidence regarding probate of Crisp's estate.

As a result, on September 1, Sauls filed a motion to show authority pursuant to Texas Rule of Civil Procedure 12 asking that Robins be "ordered to appear to produce documentation that, in fact, Cindy Crisp was alive at the time of the filing of this suit and that she had authorized the filing of this suit." *See* TEX. R. CIV. P. 12 (stating that party may file motion to require challenged attorney to appear before trial court to show authority to act on behalf of client). The trial court granted the motion and ordered Robins to "appear and show that at the time of the filing of the suit, he had authority from Cindy Crisp to file this suit, that Cindy Crisp is now deceased, and that a probate proceeding of some type has been filed so that any interest in her estate could be pursued by an heir." Robins filed a response, stating that he had emailed Noell Crisp's death certificate and that "a

7

probate court has never been involved with Cindy Crisp's passing or with her estate, and one need not be."

On September 17, the trial court held a hearing, which Austen Clinkenbeard attended. At the hearing, Robins stated that he had not filed a probate proceeding because he had no experience in probate court and was trying to save money for his client. The trial court expressed concern that Robins had filed the lawsuit "with a client that was deceased" and without the authority of her heirs. When the trial court commented that it was "strange" that Robins had only recently informed Noell that Crisp had died two years earlier, Robins stated, "Well, we were trying to keep this within the settlement range because [Noell] was almost there." The following exchange then occurred:

| Court: | It sounds like you were being dishonest with the opposing party. |
|---|---|
| Robins: | Dishonest as opposed to saying, "Hey, I think my client is dead." |
| Court: | All right. I'm done arguing with you gentlemen. You can leave. |
| Robins: | I have no incentive to be dishonest. |
| Noell: | You mean the [money] — |
| Court: | But you were dishonest. I'm not questioning your incentive. Okay. Just leave. |

8

At the close of the hearing, the trial court ordered Robins to submit additional briefing regarding his authority under Rule 12 to represent Austen Clinkenbeard. The trial court stated that it would strike Crisp's pleadings if Robins failed to do so within ten days.

In an affidavit submitted in response to Robins's TCPA motion to dismiss, Austen stated that, on the morning of the hearing, Robins "began panicking because he had not brought the necessary documents and he pleaded that I print out over a hundred pages of documents at my hotel." Robins "appeared to be completely unprepared," and Austen was "bothered" by what he observed at the hearing. Robins "ranted and raved and the judge admonished his behavior several times," and "the judge seemed to be mad at [Robins] about not promptly telling the court that [Crisp] had died in 2015." Austen further observed Robins "say on the record at a hearing in court that he had no probate experience and had only filed the suit in county court to save money." After the hearing, Austen "realized there might be more going on in the case" than Robins had disclosed.

In preparing the briefing ordered by the trial court, Robins drafted affidavits for both Clinkenbeard brothers stating that no probate proceedings were necessary for Crisp's estate because she had no debt. According to both Austen's and Jon's affidavits submitted in response to Robins's motion to dismiss, Robins pressured them to sign the affidavits of heirship. In an email dated September 27, 2017, Jon

9

informed Robins that he and Austen would not sign the affidavits, explaining that Crisp did "have debt to the nursing home she was in at the time of her passing and . . . to medicaid/care." Jon also stated that after hearing from Austen that "the judge was upset about possible 'intentional ambiguity' around our mother's death via documentation," he and Austen had "no desire to make that subject any murkier." Jon closed the email by asking Robins for a copy of their file. But Robins did not oblige.

Later the same day, the Clinkenbeard brothers sent Robins another email, stating that they were "not comfortable swearing to such a bold claim" that Crisp had no pending claims against her or any assets. They also expressed concern that the exact date Robins had learned of Crisp's death "was clearly such a sensitive issue with the judge last week," and they stated that they "no longer wish to pursue this matter" on their mother's behalf, because, while their "motivations have not changed . . . circumstances and feelings about this case certainly have." The email concluded with another request to see the client file.

The next day, September 28, Austen and Jon spoke with Robins over the telephone. They discussed the case generally and the affidavits Robins wanted them to sign. According to both Austen's and Jon's affidavits, Robins was "very rude and insulting to us and to our late mother, who he said had been a burden to

him and the state." The brothers' sentiments are reflected in an email they sent to Robins later that day:

> I'm very upset with how that call went. Neither Austen or I have ever done anything to impede this trial nor have we claimed we wouldn't help. We simply can't sign the affidavits as-is . . . . I don't think that's any reason for threats and insinuating that our mother was and is a burden to you and the state." The email reiterated the brothers' request to see their file.

Robins responded with a scathing email accusing the Clinkenbeard brothers of defrauding and betraying him and threatening to sue them for breach of the retainer agreement. He wrote, "I cannot recall when I last witnessed such a display of solipsistic callousness by two privileged young men such as yourselves." As to their requests to see their file, which he described as harassment, Robins stated that although the brothers were in no position to "further mistreat" him or to "demand repeated compliance," their "questions and requests have been adequately addressed in prior correspondence."

That same day, September 28, 2017, Robins filed a brief entitled "Plaintiffs' Counsel's Brief Supporting Proceeding to Trial Without an Otherwise Unnecessary Estate Administration," in which he argued that the case could proceed with Austen Clinkenbeard as plaintiff, and he averred—even though the Clinkenbeard brothers had told him that they believed Crisp did have outstanding debt—that no probate proceedings were necessary for Crisp's estate. Specifically, Robins stated that Sauls "has provided no evidence that any estate administration is pending

11

involving Cindy Crisp, or that pending lawsuits or active judgments exist against Cindy Crisp anywhere" and that "Attorney Rich Robins has not found any such evidence in his searches for them, either." Robins also amended the petition to add the allegation that no probate proceedings were necessary for Crisp's estate.

On October 20, 2017, the Clinkenbeard brothers sent Robins an email terminating their relationship, and, once again, demanding their file. The email stated:

> Although my brother and I both appreciate the effort you've put into this case, we would like to immediately terminate our legal relationship with you, the attorney-client contract we have with you, and officially revoke the power of attorney enumerated in our representation agreement.
>
> After my assistance and travels to the court in Tyler, and witness of your courtroom performance, after repeated dismissals of conversations for potential settlement options, after repeated disregard for written requests for our case file, and after the deterioration of your communications with us, this matter has become one that we no longer wish to pursue with you.

Both Austen's and Jon's affidavits stated that Robins never sent the file and explained that because Robins had not provided them with a description of what was in the file, "it was (and is) impossible for [them] to know what specifically to ask him to turn over."

Robins then began to demand attorney's fees from the Clinkenbeards, which surprised the brothers because this was contrary to their retainer agreement and Robins "had always said he would get paid his fees from Mr. Sauls."

On October 23, 2017, the trial court signed an order striking Crisp's pleadings and awarding Sauls $250 as sanctions against Robins. On that same day, Austen filed the underlying grievance. The State Bar Office of the Chief of Disciplinary Counsel forwarded the grievance to Robins by letter dated November 17, 2017, explaining that it classified the grievance as a "Complaint" because it alleged professional misconduct. Robins responded to the letter by electing to proceed with the complaint in district court. *See* TEX. RULES DISCIPLINARY P. R. 2.15, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A-1 (TEX. STATE BAR R. art. X, § 9) (providing that respondent attorney may elect to proceed in district court instead of having case heard by evidentiary panel appointed by Commission).

On January 5, 2018, Robins sent Austen an email withdrawing what he characterized as his "deeply discounted" settlement offer (the specifics of which do not appear in the appellate record), due to Austen's "astonishingly misleading, self-incriminating" grievance. Robins then extended a new offer to settle his claim for fees for "merely 75 hours" and threatened to sue for "a significantly larger recovery."

The Clinkenbeard brothers refused Robins's settlement offer and, on January 22, 2018, filed suit against Robins for malpractice. An appeal in the malpractice suit is currently pending before this court in *Robins v. Clinkenbeard*, appellate cause number 01-19-00059-CV. Robins then made good on his threat to sue the Clinkenbeard brothers.[4]

On July 12, 2018, the Commission filed the underlying professional misconduct suit against Robins in Harris County District Court. The Commission's petition alleged that Robins violated Texas Disciplinary Rules of Professional Conduct 1.15(d) (requiring lawyer to provide client file upon termination of representation), 3.01 (prohibiting lawyer from filing frivolous cases), 3.02 (prohibiting lawyer from taking position that causes unreasonable increase in costs or delay), 3.03(a)(2) (prohibiting lawyer from withholding facts from tribunal necessary to avoid assisting in crime or fraud), and 8.04(a)(3) (prohibiting lawyer from engaging in dishonest, fraudulent, or deceitful conduct or misrepresentations). *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d), 3.01, 3.02, 3.0d(a)(2), 8.04(a)(3), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit.

---

[4]    The Cllinkenbeards filed their suit against Robins in Smith County. After Robins filed suit against the Clinkenbeards two months later in Harris County, the Clinkenbeards dismissed their Smith County suit and asserted their legal malpractice claim as a counterclaim in Robins's Harris County suit.

G, app. A (Tex. State Bar R. art. X, § 9). The Commission asked that Robins be reprimanded, suspended, or disbarred.

Robins filed a motion to dismiss pursuant to the TCPA. He argued that the TCPA applied to the disciplinary action against him for two reasons. First, the grievance "stem[s] directly from" communications he made to or on behalf of the Clinkenbeards in exercise of his rights to free speech, petition, and association. Robins's motion did not offer any legal analysis in support of this assertion, nor did it identify the communications he contended were TCPA-protected.

Robins asserted as a second basis for TCPA protection that the Commission filed suit to silence him in his criticisms of the State Bar of Texas—specifically, his involvement online and in the Legislature with the sunset review of the State Bar of Texas—"for the Texas Bar's and [the Commission's] selfish benefit."

Robins also argued that the Commission could not make a prima facie case for its allegations of professional misconduct and, even if it could, that he had established valid defenses to the Commission's claims. In support of his motion, Robins attached some fifty exhibits, including his own affidavit, in which he states that the grievance was "largely conjured up by [the Commission] amidst the Sunset Review's ongoing probing and reforming" of the State Bar. He explained that he did not disclose his suspicion that Crisp had died because he did not wish to "subject future clients and their cases to accusations of hysterical sensationalism,

15

[et cetera] by risking prematurely and potentially inaccurately reporting the death of a client," as "[e]ven verbally reported deaths might involve (for example) simply being hospitalized in a comatose state and euphemistically described to others as no longer among the living."

With regard to the allegation that he had failed to produce the client file, Robins stated that he had already sent the Clinkenbeards "all that [he] thought could help them succeed" and that "work product was already shared satisfactorily through emails." Specifically, he stated that he had emailed them "practically every single pre-trial court filing (if not every one) in the case contemporaneously with [his] actually filing it" and that he had given them "the documents on a thumb drive." He also asserted a lien over the file.

Regarding the settlement offers, Robins stated that Noell extended them before the Clinkenbeards became his clients and that he had the right to decline the "pittance-sized" and "woefully insufficient" offers.

The Commission responded to Robins's motion to dismiss, arguing that the TCPA does not apply to disciplinary proceedings in general, and even if it did, it did not apply to this case because Robins failed to show by a preponderance of the evidence that the Commission's suit was based on, related to, or in response to Robins's exercise of the rights of free speech, petition, or association.

16

The Commission also argued that it presented a prima facie case for each element of its claims against Robins and that Robins failed to establish otherwise. Among the exhibits it attached to prove its prima facie case were Austen's and Jon's affidavits. In addition to the statements from those affidavits recounted above, Jon's affidavit stated that when he and Austen told Robins at the outset that they could not afford to pay "any expenses or fees up-front," Robins assured them that "Mr. Sauls would eventually pay all of that." And Austen's affidavit stated that Robins advised Jon and him not to settle the case against Sauls and "would press [them] to continue litigation in court." Austen's affidavit also stated that it was only after he had signed the retention agreement that Robins told them that he had previously received a settlement offer for the full amount of the bounced checks, and only recently that he had learned (in connection with the malpractice suit) that Noell had made another offer to settle "for the amount of the check[s] plus $2,500," which was "also apparently declined by Mr. Robins without consulting my brother or myself." Further, prior to the September 17 hearing, Robins had not explained that Crisp's death "was such a potential problem in our case."

The Commission also attached several email threads between Robins and the Clinkenbeard brothers (mentioned above), which it argued, in conjunction with the Clinkenbeards' affidavits, showed that Robins's top priority in the litigation was to

17

recover his attorney's fees so that he could pay off his law school loans and that he let this motivation drive him to make numerous misrepresentations to the Clinkenbeards, Sauls's counsel, and the trial court.

The Commission also attached Noell's affidavit, stating that he incurred fees for Sauls for "engaging in futile settlement negotiations (since Mr. Robins had no client to consult about the settlement); appearing at a futile trial setting in April 2017 (since Mr. Robins had no client); drafting and sending futile discovery requests (that could never be answered or sworn-to by Ms. Crisp); trying to arrange for a futile deposition; and preparing my client's case for trial."

After a hearing, the trial court signed an order denying Robins's motion to dismiss, finding that the TCPA does not apply to disciplinary proceedings, the Commission has statutory immunity from suit, Robins failed to meet his burden to show that the Commission's suit is "in any way related to or in response to" Robins's exercise of TCPA-protected rights, and the Commission established a prima facie case for each element of its claims by clear and specific evidence. Robins appeals this order.

## Texas Citizen's Participation Act

### A.     Standard of Review

We review de novo the denial of a TCPA motion to dismiss. *Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 199 (Tex. App.—Houston [1st Dist.] 2017,

18

no pet.). In determining whether to grant or deny a TCPA motion to dismiss, the court must consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based. TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a). We view the evidence in the light most favorable to the nonmovant. *Dolcefino*, 540 S.W.3d at 199; *see Cheniere Energy, Inc. v. Lotfi*, 449 S.W.3d 210, 214 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

## B. TCPA Statutory Scheme

The TCPA was enacted to safeguard the constitutional rights to petition, speak freely, associate freely, "and otherwise participate in government" from infringement by meritless lawsuits. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.002. To achieve this purpose, the TCPA provides for dismissal if the movant shows by a preponderance of the evidence that a legal action filed against it is based on, relates to, or is in response to the moving party's exercise of the right of free speech, the right to petition, or the right of association. *Id.* § 27.005(b).

If the movant meets this burden, the trial court must dismiss the action unless the nonmovant establishes by "clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c); *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding) ("In reviewing [a TCPA motion to dismiss], the trial court is directed to dismiss the suit unless 'clear

and specific evidence' establishes the plaintiffs' 'prima facie case.'") (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c)).

Once a TCPA nonmovant establishes a prima facie case for its claim, the movant may still obtain a dismissal if it "establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d).[5]

## C. Prima Facie Case

Robins's first and second issues challenge the trial court's findings that the TCPA does not apply to this action. We need not address these issues because we conclude that the Commission's pleadings and exhibits provide clear and specific evidence of a prima facie case for professional misconduct.[6] *See* TEX. R. APP. P. 47.1 (stating that appellate court opinions should be as brief as practicable in addressing only issues necessary to final disposition).

---

[5] The amended TCPA requires dismissal of the underlying suit if the moving party "establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 3, 2019 Tex. Sess. Law Serv. 684, 685 (codified at TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d)).

[6] Section 27.0101(a)(10) of the amended TCPA expressly exempts "disciplinary action[s] or disciplinary proceeding[s] brought under Chapter 81, Government Code, or the Texas Rules of Disciplinary Procedure." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(a)(10) (eff. Sept. 1, 2019). Although inapplicable to this case based on its filing date, this amendment settles the question whether disciplinary proceedings are subject to the TCPA going forward.

20

Under TCPA section 27.005(c), the trial court may not dismiss the action if the plaintiff establishes "by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). In this context, the Texas Supreme Court has clarified that "clear" means "unambiguous, sure, or free from doubt," "specific" means "explicit or relating to a particular named thing," and "prima facie case" means evidence that is legally sufficient to establish a claim as factually true if it is not countered. *See In re Lipsky*, 460 S.W.3d at 590. In other words, a prima facie case is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)). "The supreme court has expressly disapproved interpretations of the TCPA that 'require direct evidence of each essential element of the underlying claim to avoid dismissal,' and instead it has held that pleadings and evidence that establish the facts necessary to support the essential elements of a claim are sufficient to resist a TCPA motion to dismiss." *Universal Plant Servs., Inc. v. Dresser-Rand Grp., Inc.*, 571 S.W.3d 346, 359 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (quoting *In re Lipsky*, 460 S.W.3d at 590–91). "The TCPA requires only that evidence be 'clear,' 'specific,' and 'sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted.'" *Id.* (citing *In re Lipsky*, 460 S.W.3d at 590).

The Commission's petition alleges that Robins engaged in professional misconduct by violating Texas Disciplinary Rules of Professional Conduct 1.15(d) (requiring lawyer to provide client file upon termination of representation), 3.01 (prohibiting lawyer from filing frivolous cases), 3.02 (prohibiting lawyer from taking position that causes unreasonable increase in costs or delay), 3.03(a)(2) (prohibiting lawyer from withholding facts from tribunal necessary to avoid assisting in crime or fraud), and 8.04(a)(3) (prohibiting lawyer from engaging in dishonest, fraudulent, or deceitful conduct or misrepresentations). *See* TEX. RULES DISCIPLINARY P. R. 1.06(CC)(1) (defining "professional misconduct" to include acts or omissions by attorney that violate one or more of Texas Disciplinary Rules of Professional Conduct).

### 1. *Filing and Continuing to Litigate a Suit Without a Reasonable Basis*

The Commission alleges that Robins violated Rule 3.01 by filing and continuing to litigate Crisp's case against Sauls. Rule 3.01 states:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.01. The "Terminology" section of the disciplinary rules defines the word "reasonably" to mean "the conduct of a reasonably prudent and competent lawyer" and "reasonably believes" to mean that "the lawyer believes the matter in question and that the circumstances are such that

22

the belief is reasonable." TEX. DISCIPLINARY RULES PROF'L CONDUCT, *Terminology*.

Important in evaluating the Commission's allegation that Robins's conduct was unreasonable is the legal principle that a deceased person does not have actual or legal existence and therefore cannot bring suit. *See Armes v. Thompson*, 222 S.W.3d 79, 83–84 (Tex. App.—Eastland 2006, no pet.). In cases where a plaintiff dies after having filed suit, claims that survive her death belong to her heirs, subject to the administration of her estate. *Id.* at 84. And while her estate itself cannot pursue such claims, it may do so through a representative. *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005) (holding that representative of decedent must pursue survival claims on decedent's behalf).

The Commission identifies three instances in which Robins allegedly violated Rule 3.01.

### a. Actions taken without knowledge that client was alive

First, Robins filed suit for Crisp when "it was not particularly clear" to him that she was alive. And he continued to litigate the case in her name, including refusing a settlement offer on Crisp's behalf. The Commission alleges and argues that a reasonably prudent attorney would not believe that such conduct is non-frivolous, as he would know that a deceased person cannot, without a personal representative, invoke a court's jurisdiction. *See id.* ("Certain individuals are

23

afforded the capacity to bring a claim on an estate's behalf. In general, only the estate's personal representative has the capacity to bring a survival claim."); *Armes*, 222 S.W.3d at 83–84 (holding that deceased person's petition cannot invoke trial court's jurisdiction because decedent does not have actual or legal existence and thus does not have standing to bring suit).

We agree with the Commission, and we conclude that these allegations, supported by emails and affidavit testimony, constitute clear and specific evidence of a prima facie case for professional misconduct based on violation of Rule 3.01. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.01.

### b. Actions taken after learning of client's death

The Commission next argues that a reasonably prudent lawyer would not believe that there was a non-frivolous basis for continuing, as Robins did, to litigate a case without a living client.

It is undisputed that by March 2017, Robins had been informed by the Clinkenbeard brothers that their mother had died in 2015 and that Robins continued to prosecute the suit as if Crisp were still alive. And while it is not determinative of the issue, we note that the Commission also alleges and offers affidavit evidence that, after learning of Crisp's death, Robins went so far as to discuss Crisp's availability for a deposition with opposing counsel.

Robins argues that his decision to continue the litigation in Crisp's name was reasonable because, even today, it "remains uncertain whether or not Cindy Crisp is indeed dead." He contends that "there are cryonic preservation options that a lawyer is duty-bound to consider under such circumstances," such as Crisp's "possibly [being] left alive albeit institutionalized and perhaps comatose (while remaining dependent upon Medicaid)." Robins repeatedly imputes sinister motives to the Clinkenbeard brothers, asserting that they "had monetary incentives (an inheritance) to coax a coroner to sign a death certificate" and claiming that they "got a lake house as a result of [Crisp's] death, which they would not have gotten if they had instead reverse-mortgaged that home while she was still alive."

Robins's professed, but unsupported, belief that Crisp is still alive and either in a coma induced by her sons or cryogenically frozen, is unreasonable by any standard, and this belief did not provide a reasonable basis for his failure to respond as a reasonably prudent lawyer would to news of his client's death. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.01, cmt. 1 ("The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure. The law, both procedural and substantive, affects the limits within which an advocate may proceed.").

We conclude that the Commission carried its burden to produce clear and specific evidence that it was objectively unreasonable for Robins to decline to take

25

whatever steps may have been available to him to proceed legally—whether by substituting in an heir as a personal representative for Crisp, probating her estate, or otherwise—or to discontinue the litigation, and to instead continue for several months as though Crisp were alive, concealing news of her death from opposing counsel and the trial court. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.01.

### c. Actions taken after disclosing client's death

The Commission also alleges and argues that Robins violated Rule 3.01 by his conduct after he informed the trial court and opposing counsel of Crisp's death. It is undisputed that Robins sought to continue litigating Crisp's case by substituting one of her heirs as her representative. This could only be accomplished if the heir pleads and proves that no estate administration is pending or necessary. *Shepherd v. Ledford*, 962 S.W.2d 28, 31–32 (Tex. 1998) (holding that heirs at law can maintain survival suits if they "allege and prove that there is no administration pending and none necessary").

When Robins asked the Clinkenbeard brothers to sign affidavits stating that their mother had no debts, they refused and explained that they were unsure that such a "bold" statement was true because they believed Crisp did have outstanding debts to her nursing home and to Medicaid or Medicare. Undeterred, Robins immediately filed a brief with the trial court in which he affirmatively stated that

26

because Crisp did not have any debts, the case could proceed without probate with Austen Clinkenbeard as plaintiff. Robins also filed an amended petition adding Austen as plaintiff and alleging that no probate proceedings were necessary for Crisp's estate.

These allegations and record facts satisfy the Commission's burden to present clear and specific evidence that a reasonably prudent lawyer would not have acted as Robins did in pleading facts that his clients specifically refused to affirm, and thus that Robins violated Rule 3.01. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.01.

### 2. *Causing Unreasonable Cost and Delay*

The Commission alleges that Robins violated Rule 3.02, which states:

> In the course of litigation, a lawyer shall not take a position that unreasonably increases the costs or other burdens of the case or that unreasonably delays resolution of the matter.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.02.

As stated above, although the Clinkenbeard brothers informed Robins of Crisp's death in March 2017, it was not until June 27, 2017—just two days before the hearing scheduled on Noell's motion for sanctions for Robins's failure to respond to discovery—that he alerted the court and opposing counsel of this fact. The Commission argues that Robins's decision to withhold his knowledge of Crisp's death caused his opposing counsel, Noell, to have to file additional motions

27

and briefing and caused the court to have to hold a hearing to determine whether Robins was authorized to continue prosecuting the suit against Sauls on Crisp's behalf. Its evidence includes Noell's affidavit stating that he incurred fees on Sauls's behalf for "engaging in futile settlement negotiations," "appearing at a futile trial setting," "drafting and sending futile discovery requests," "trying to arrange for a futile deposition," and "preparing my client's case for trial." This evidence clearly and specifically establishes a prima facie case for the Commission's allegation that Robins's failure to disclose Crisp's death caused increased costs and delay.

Reading his brief liberally, it appears Robins argues that his decision to withhold this information was not unreasonable. *Id.* (prohibiting lawyer from taking position that "unreasonably" increases costs or delays). First, he claims that he "was duty-bound to preserve Cindy Crisp's privileged confidences, such as her having apparently been abandoned by her family and possibly left alive albeit institutionalized and perhaps comatose (while remaining dependent upon Medicaid)." He also claims that he "risked violating rules of confidentiality by e-mailing the Smith County court to report claims of her death," which he did "even though he had not been able to substantiate such reports with any available online obituary publication or potentially relevant probate court database."

28

We agree with the Commission that the explanations Robins provides for waiting three months to alert opposing counsel and the court of his client's death are not reasonable, and we conclude that the Commission established by clear and specific evidence a prima facie case that Robins's decision to conceal his client's death from opposing counsel and the trial court unreasonably caused additional cost and delay in violation of Rule 3.02. *Id.*

### 3. *Engaging in Dishonest and Fraudulent Conduct*

The Commission alleges that Robins violated Rules 8.04(a)(3) and 3.03(a)(2) by failing to disclose Crisp's death, continuing to litigate her case as though she were alive, and other dishonest or fraudulent conduct.

Rule 8.04(a)(3) states:

> A lawyer shall not . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . .

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 8.04(a)(3). The disciplinary rules define "fraud" to include "conduct having a purpose to deceive and not merely negligent misrepresentation or failure to apprise another of relevant information." TEX. DISCIPLINARY RULES PROF'L CONDUCT, *Terminology*. And although the rules do not define "dishonesty," "deceit," or "misrepresentation," courts applying Rule 8.04(a)(3) have given those terms their ordinary meanings, holding that they generally a mean "lack of honesty, probity, or integrity in principle," and a "lack of straightforwardness." *See, e.g.*, *Rosas v. Comm'n for Lawyer Discipline*, 335

29

S.W.3d 311, 316 (Tex. App.—San Antonio 2010, no pet.); *Thawer v. Comm'n for Lawyer Discipline*, 523 S.W.3d 177, 186–87 (Tex. App.—Dallas 2017, no pet.).

The Commission argues that the following conduct on Robins's part exhibits a lack of straightforwardness:

- After he learned of his client's death, Robins proceeded as though he still had a living client. He notified opposing counsel and the trial court only two days before a hearing scheduled on opposing counsel's motion for sanctions for his failure to respond to discovery. An email to the Clinkenbeard brothers shows that Robins's decision was motivated by his desire to avoid discovery sanctions by having the brothers sign retainer agreements and then updating the discovery he had been unable to answer since he did not have a living client. When the trial court asked Robins about his failure to disclose Crisp's death, he stated that he did not want to derail the parties' settlement negotiations, to which the trial court responded that Robins was "dishonest."

- Despite admitting that he had been unable to reach Crisp for over two years and that "it was not particularly clear" to him that she was alive, Robins represented to opposing counsel Noell that Crisp was alive when he declined a settlement offer on her behalf.

- After learning from the Clinkenbeard brothers that Crisp had died, Robins discussed possible dates for Crisp's deposition with opposing counsel Noell.

- After disclosing Crisp's death, Robins represented in court filings (including a brief regarding his authority to act and an amended petition) that Crisp did not have any debt requiring probate of her estate.

We conclude that each of these actions or omissions is clear and specific evidence of a prima facie case that Robins "lacked straightforwardness" in violation of Rule 8.04(a)(3). *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 8.04(a)(3).

30

The Commission also argues that Robins's failure to timely disclose Crisp's death and his conduct in continuing to litigate her case as though she were alive is clear and specific evidence of a prima facie case that he violated Rule 3.03(a)(2). Like Rule 8.04(a)(3), Rule 3.03(a)(2) addresses dishonesty, but it requires more than a lack of straightforwardness:

> A lawyer shall not knowingly . . . fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act . . . .

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.03(a)(2). Again, the disciplinary rules define "fraud" to include "conduct having a purpose to deceive and not merely negligent misrepresentation or failure to apprise another of relevant information." TEX. DISCIPLINARY RULES PROF'L CONDUCT, *Terminology*; *Thawer*, 523 S.W.3d at 186–87.

The Commission argues that it has presented clear and specific evidence that Robins's failure to disclose that Crisp was deceased and that she had outstanding debt was not merely negligent but was designed to deceive, with the purpose of keeping the litigation going for his own financial gain. Specifically, the Commission argues that email evidence supports the inference that Robins withheld this information for the purpose of securing his fees.

Robins indicated in at least two emails to the Clinkenbeard brothers what was driving his zeal to keep the case alive, stating,

31

I want to get you guys the biggest award realistically obtainable, but I need to balance that with how law school's painfully expensive. At nearly 10% annually compounded interest, you can imagine how excruciating that pain is especially for someone who already repaid the principal of his student loans long ago . . . but who still owes considerably more because the greedy feds charge such a high premium for student loans . . . . [B]illing Sauls for my several dozen (and growing) hours of attorney time . . . naturally remains a priority for me. The (interest-accruing) cost of law school helps make that understandable.

We find it significant that, despite having been unable to reach his client for over two years, Robins rejected a settlement offer that would have given her a full recovery as well as $2,500 for court costs and Robins's fees. Robins did so despite his ethical obligation to consult with and abide by his client's decision whether to accept a settlement offer. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.02(a)(2) (stating that, subject to certain exceptions, lawyer must abide by client's decision "whether to accept an offer of settlement of a matter").

We agree with the Commission that, under the unique circumstances of this case, the revelations in the emails combined with Robins's rejection of the settlement offer constitute clear and specific evidence of a prima facie case that Robins was purposefully deceptive in failing to disclose facts to the trial court in violation of Rule 3.03(a)(2). *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.03(a)(2).

#### 4.     *Refusing to Turn Over Client File*

The Commission contends that Robins violated Rule 1.15(d) when he failed to provide the Clinkenbeards with their client file. Rule 1.15(d) states:

> Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law only if such retention will not prejudice the client in the subject matter of the representation.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d); *see also In re McCann*, 422 S.W.3d 701, 704 (Tex. Crim. App. 2013) (orig. proceeding) ("To whom does a client's file belong? The client's file belongs to the client."); *In re George*, 28 S.W.3d 511, 516 (Tex. 2000) (orig. proceeding) ("The attorney is the agent of the client, and the work product generated by the attorney in representing the client belongs to the client.").

The record shows, and Robins does not deny, that the Clinkenbeard brothers sent Robins several requests to turn over their case file, to no avail. Robins makes several arguments to avoid application of Rule 1.15(d).

First, Robins argues that Rule 1.15(d) only applies to cases that are being turned over to another attorney for further litigation, as opposed to Crisp's case, which Robins claims the Clinkenbeard brothers "wanted to terminate . . . as they did not welcome scrutiny of their inheritance (a lake house) from their mother,

33

Cindy Crisp, who nevertheless left taxpayers with Medicaid-financed nursing home bills." Because Robins offers no authority or legal analysis for his assertion other than that it is "self-evident," we do not address the merits of this argument.

The same is true for his second argument, which is that the Clinkenbeard brothers were not specific enough about which documents they sought. Robins cites to Texas Rule of Appellate Procedure 34.5(b), which addresses requests for items to be included in the appellate record and is clearly inapplicable here. *See* TEX. R. APP. P. 34.5(b)(2) ("A party requesting that an item be included in the clerk's record must specifically describe the item so that the clerk can readily identify it. The clerk will disregard a general designation, such as one for 'all papers filed in the case.'"). Further, both Austen's and Jon's affidavits stated that because Robins had not provided them with a description of what was in the file, "it was (and is) impossible for [them] to know what specifically to ask him to turn over."

Robins also argues that the Clinkenbeard brothers' affidavits stating that they had requested the file were "conveniently self-serving" and conclusory. Even if we agreed, which we do not, the Commission also provided several emails between Robins and the Clinkenbeard brothers that include requests for the file.

Finally, Robins maintains—again, without analysis—that he is not required to turn over the file because he is asserting a lien over it. *See* TEX. DISCIPLINARY

34

RULES PROF'L CONDUCT R. 1.15(d); *see also* TEX. COMM. ON PROF'L ETHICS, Op. 610, 74 Tex. B.J. 857, 858 (2011) ("[A] lawyer has a right to claim a common law possessory lien against a client's property, money and papers for the payment of amounts due the lawyer for services and expenses."). But retention of a client's file is permitted "only if such retention will not prejudice the client in the subject matter of the representation." TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d); *accord* TEX. COMM. ON PROF'L ETHICS, Op. 610, 74 Tex. B.J. at 858 ("[T]his lien on a client's documents is subject to the important limitation set forth in Rule 1.15(d) . . . that a lawyer 'may retain papers relating to the client to the extent permitted by other law only if such retention will not prejudice the client in the subject matter of the representation.'"). As reflected in several of the emails in the record, the Clinkenbeard brothers repeatedly expressed to Robins their concern over the way he was conducting the litigation. Further, liens against a client's file are for "payment of amounts due the lawyer for services and expenses." *See* TEX. COMM. ON PROF'L ETHICS, Op. 610, 74 Tex. B.J. at 858. According to the retainer agreement—as well as the Clinkenbeard brothers' affidavits and statements in their emails with Robins—Robins agreed that his fees would be paid by the defendant, Sauls, and not by the Clinkenbeard brothers.

We conclude that the Commission met its burden of establishing by clear and specific evidence a prima facie case for each element of its professional

misconduct claim against Robins. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).

We overrule Robins's third issue.

### a. Defenses

In his fourth issue, Robins argues that even if the Commission established a prima facie case for its professional misconduct claim, he is entitled to dismissal under the TCPA because he established by a preponderance of the evidence each essential element of a valid defense. *See id.* § 27.005(d). Although he makes this argument in a global manner, his brief only urges it with regard to the Commission's allegation that he failed to provide the Clinkenbeards with their client file. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d).

Robins contends that he established the defense of "compliance," and, as a result, the district court erred in refusing to dismiss the Commission's action with regard to this allegation. Without addressing whether this qualifies as a defense under section 27.005(d), we conclude that Robins has not proven compliance by a preponderance of the evidence. He asserts only that the Clinkenbeard brothers had already received "practically every single pre-trial court filing," that he had given them "the documents on a thumb drive," and that because they have the case number, they can "independently obtain" the court records from the county court. But he does not ever actually state that he has given the Clinkenbeard brothers

36

everything he has for their case, and, indeed, Austen Clinkenbeard's affidavit states that he did not learn until after receiving discovery in the related malpractice case that Noell had made an offer to settle the case "for the amount owed plus $2,500."

We conclude that Robins has not established by a preponderance of the evidence that his refusal to turn over the client file upon termination of the attorney-client relationship was justified by his belief that he had already provided the Clinkenbeard brothers with certain documents during the representation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d).

We overrule Robins's fourth issue.

**Conclusion**

We affirm the trial court's order denying Robins's TCPA motion to dismiss.


Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Landau.